## SOUTHERN EXPRESS COMPANY *v.* WILLIAMS.

1. A written order, dated at a place where an express company had no office, addressed to an agent of the company at its office where consignments to the writer were to be transferred to a railroad company, and directing that agent to "deliver any and all express matter (moneys included) addressed to [the writer] to the conductor of" that railroad "until further notice," and concluding with the words, "this my standing order," until

revoked authorized deliveries of such matter to be made, not only to the person who happened to be conductor at the time the order was signed, but to any other person occupying that position and acting in that capacity.

2. Where goods are received by an express company under a contract for their delivery to a named consignee at a point beyond its terminal office, and the company, at that office, delivers such goods to an agent of that consignee duly authorized to receive them, such delivery completes the contract of carriage. This is true although the goods were not ordered by the consignee to whom the shipper really intended to send them, but by another person bearing or pretending to bear the same name, to whom the goods were finally delivered after passing through the hands of the real consignee's agent.

August 10, 1896.

Action for damages. Before Judge Ross. City court of Macon. December term, 1895.

J. H. & W. W. Williams sued the Southern Express Company, a common carrier, for $185, the value of a diamond ring and scarf pin. The charge of the court was a virtual direction to find for the plaintiffs the proved value of the property; and the defendant's motion for a new trial was overruled. The evidence shows, that the plaintiffs, who were in the jewelry business in Macon, received an order for the goods, purporting to come from Swainsboro, and signed by J. C. Coleman. They had had no previous dealings with that person, but upon inquiry ascertained that he was a wealthy and responsible merchant residing at Swainsboro. They thereupon enclosed the goods in a pasteboard box, wrapped and sealed, addressed to Coleman, and on the outside of the package were the words: "J. H. & W. W. Williams, Jewelers, Macon, Ga." One of plaintiffs inquired of defendant's office in Macon by telephone, whether they had an office at Swainsboro, and received an affirmative answer, which was a mistake, as the company had no office or agent there. He testified that he sent the package to the express office by one of the clerks in his store; while the testimony of one of the company's employees was, that he received the package at the

store on the company's wagon. No value was written
upon the package, nor was any inquiry or representation
made as to value. The company's employees treated the
package as of more value than ordinary freight, sending
it through the money department of the company, as they
did with all jewelry packages, supposing them to be worth
more than ordinary packages and being more particular
with them. Plaintiffs were in the habit of frequently
sending packages by the defendant company, sometimes
valuing them and oftener not. The nearest office de-
fendant had to the point of destination was Midville, from
which the Midville, Swainsboro & Red Bluff Railroad
ran to Swainsboro. The defendant's agent at Midville
had a written order from J. C. Coleman of Swainsboro,
dated January 23, 1890, in these words: "Please deliver
any and all express matter (moneys included) addressed
to me, to the conductor of the M., S. & R. B. Railroad,
until further notice. This my standing order." The con-
ductor of the railroad, at the time this order was written
and at the time of the shipment in question (which was
March 11, 1895), was one Brannen. On March 12, when
the package was received by the defendant's agent at Mid-
ville, he delivered it (with another package also addressed to
J. C. Coleman, valued at $750) to one Kelly, who was on
that day acting as conductor of the railroad train in place
of Brannen who was absent. Kelly's usual position was
that of train-hand; he had been with this railroad about
two years. He signed Brannen's name to the receipt for
the package; and Brannen testified that he was authorized
to do this in Brannen's absence. Kelly's testimony does
not appear to have been taken. According to that of the
railroad agent at Swainsboro, the package in question was
probably among several others that Kelly brought to him,
and which he delivered to a man calling himself J. C.
Coleman, not the merchant of Swainsboro. It appears
that this man came to that town about midday of the 11th

of March, and left there on the night of the 12th.   The
evidence indicates that he was an impostor who had as-
sumed various names, though it does not definitely appear
what his real name was.   It appears also, that the order
which plaintiffs received for the goods was not sent by the
genuine J. C. Coleman.   The agent just referred to testi-
fied as follows:  I recollect receiving, in March, 1895, from
the conductor of the road of which I am agent, some jew-
elry consigned to J. C. Coleman, Swainsboro.   The first
package I received on March 11, I delivered to a party
who identified himself as J. C. Coleman.   When the con-
ductor came, he said he had a package for J. C. Coleman,
and handed it to me.   Shortly afterward the resident J.
C. Coleman, merchant, stepped into my office, and I told
him I had a package for him.   He opened it and said, "I
don't know anything about it; you had better take it," and
handed it back to me.   The contents of that package were
papers.   In the course of half an hour the other man (who
subsequently turned out to be a swindler) came in and
asked if there was a package for J. C. Coleman.   He stated
that he was J. C. Coleman, and handed me an express
receipt for this package, which had been forwarded from
Jacksonville.   I then delivered it to him, and he receipted
for it as J. C. Coleman.   He said he was going to do some
jewelry business there.   I did not think there was any-
thing unusual about that.   The first consignment was de-
livered on March 11.   I delivered three others to him;
two packages were valued at $1,000 each, and one at $750.
There was another package on which there was no value.
I do not know whether that package was from Macon.   I
can't say that I delivered to the bogus Coleman a package
which had been shipped by J. H. & W. W. Williams;
there was one sealed package.   I don't know who shipped
that sealed package which was not valued.   It was an or-
dinary express envelope; it seemed to be paper.   I do not
remember the names of the shippers, except Bruhl of

Macon. (It elsewhere appears that Bruhl was the shipper of the package valued at $750, entry of which was made on the same way-bill with the package shipped by Williams.) I delivered to this man identifying himself as J. C. Coleman any package addressed to J. C. Coleman, Swainsboro, which the conductor delivered to me. I delivered only one package to this transient J. C. Coleman on March 11; that was the package of papers I have referred to. I received and delivered to him on the 12th of March four packages. I know that two of them were valued at $1,000 each, and one at $750. I am certain about that. The other package that I delivered to him was a sealed package; it was not a box; it was a package in an express envelope. I do not remember where that was from. As near as I can come to it—there is no certainty about it—one was from Bruhl, another one from Macon I think, and one from Atlanta. I delivered him no other packages than these mentioned by me. I had this conversation I have referred to with the bogus Coleman on the eleventh. I saw Brannen, the conductor, after that, and told him we had another J. C. Coleman at Swainsboro; he did not know that fact up to that time. This was about four o'clock in the afternoon of the eleventh, after the train came back from Midville. He brought some packages with him on that trip, but I did not deliver them. He brought some packages on the morning of the 12th of March, addressed to J. C. Coleman. I do not remember anything particularly about a conversation I had with Kelly about this new man Coleman; quite natural that we should have had something to say about it. I am not prepared to say whether Kelly knew of it on the eleventh or twelfth. He acted as conductor on the twelfth, Brannen having business in court at Waynesboro. Kelly had been in the habit of acting as conductor from time to time, when necessary. When a package comes by express for a party at Swainsboro, it is transferred by the express

agent at Midville to the railroad conductor, who brings it to me, and then it is turned over by me to the proper party; sometimes it is turned over by the conductor when I am busy. The packages go through my office; a good many deliveries are made that I have nothing to do with. I do not know whether the express company has any arrangements with the railroad in reference to that business. Freight is charged on packages brought over the railroad from Midville to Swainsboro, the same as on any other freight. Brannen, the conductor, pays the express company charges at Midville at the time he takes them from that company. He has orders from some of the people at Swainsboro for the agent of the express company at Midville to deliver to him packages that come for them.

There was testimony by Brannen, substantially to the same effect as that of the agent of the railroad. The express agent at Midville testified that he made delivery of packages to Kelly prior to March, 1895, for consignees at Swainsboro; was not positive he had so delivered packages for J. C. Coleman, but thought he had, to the best of his recollection, as Coleman was getting packages regularly by express. Said deliveries were made to Kelly as conductor of the train. There was no objection from Coleman to this, and Brannen had authorized it. Brannen testified that J. C. Coleman knew that Kelly acted as conductor in the absence of Brannen.

*Erwin, duBignon & Chisholm* and *Dessau & Hodges,* for plaintiff in error. *Ryals & Stone,* contra.

ATKINSON, Justice.

The obligation assumed by the express company in accepting for transportation the goods of the consignor was to deliver the goods to the consignee at the point of destination in accordance with the contract of shipment. The duty imposed by this undertaking was well performed when the company delivered the goods either to the

consignee, or to his duly appointed agent, either at the point of destination, or at an intermediate point at which the consignee was willing to accept delivery. The carrier is not at all events bound to deliver at the place designated in the bill of lading. Presumptively the consignee is the owner, entitled to receive the goods shipped, and unless at the time the contract of affreightment is made, "the carrier is advised that the consignor has not parted with his title, and that it is to vest in the consignee only upon the performance of certain conditions, as, for instance, the payment of their price, a delivery at any place appointed by the consignee will discharge the carrier from his liability, even though it should not be the place appointed by the consignor." Hutchinson on Carriers, §394. The fact, therefore, that the goods were delivered, under the circumstances of the present case, at a point other than that designated in the bill of lading, was a breach of no duty owing from the carrier to the consignor. No conditions precedent to delivery were imposed upon the consignee, of which the carrier was advised; and the delivery, if to the proper person, even though made at an intermediate point, was well accomplished. This being true, we will proceed to inquire whether the delivery was made to the person actually designated in the bill of lading as the consignee, and to the person to whom the consignor supposed that they were consigned. The name of the real consignee was J. C. Coleman. He was a reputable merchant engaged in business at Swainsboro. He had given to the agent of the defendant company at Midville, prior to the time the goods in question were shipped to him, a written order in the following words: "Please deliver any and all express matter (moneys included) addressed to me, to the conductor of the M., S. & R. B. Railroad, until further notice. This my standing order." The express company had an office at Midville; it had none at Swainsboro. In the ordinary course of his business the con-

signee had found it convenient to have goods destined for him at Swainsboro by express, delivered to the conductor of the Midville, Swainsboro & Red Bluff Railroad Company, who had charge of the company's trains between Swainsboro and Midville. This general order was executed by the consignee and delivered to the agent of the express company at Midville in order to effectuate more conveniently this arrangement. At the time the order was given, the name of the conductor who was engaged in running this train was Brannen, but it so happened that on the day of the delivery of the goods in question, the train was run by one Kelly as conductor. We do not regard this circumstance, however, as material. The object of Coleman, the consignee, in specifying the conductor of this train as the person who should, in his name, receive from the express company any goods consigned to him, was not to constitute any particular individual his agent, but the legal effect of the order was to constitute the person holding the office and discharging the duties of conductor as his agent. Presumably, the railroad company would appoint only responsible men to that position, and at all events he reposed his confidence in the official designated by the railroad company to discharge the duty of conductor, rather than in the individual who, at the time the order was written, happened to occupy that position. Had it been the purpose of the consignee to confer this power upon a particular individual, that individual would have been named or described in such manner as would admit of his personal identification; but where the power was referred to the "conductor" generally, we do not doubt that it was well exercised by any person who, at the time, was entrusted by the railroad company with the discharge of the duties of that responsible position. Having given the direction to the express company in general terms, if the railroad company thereafter, in the conduct of its business, selected a person unworthy of trust, it was his duty to revoke the

order, which might have been done at any time. This being true, we are unable to find in this record any evidence of a breach of duty upon the part of the express company toward the consignor. As we have seen before, the place of delivery was immaterial; and as we have endeavored to show, the goods were delivered in accordance with the direction of the consignor to the consignee, by and through the duly appointed agent of the latter, who was fully authorized to receive them. Having discharged its full duty toward the consignor, it can make no difference that subsequent to the time the goods went into the hands of the duly accredited agent of the consignee, they were by him negligently delivered to a person other than the consignee, who was not entitled to receive them. That the person to whom the delivery was ultimately made practiced a fraud upon the consignor, does not authorize the courts to impose upon the express company a responsibility when it has been faultless in the premises.

Without undertaking to deal with the many minor questions which appear in the record, the judgment of the trial judge refusing a new trial is reversed upon the ground that the verdict is contrary to law. *Judgment reversed.*